**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MARCUS D. SANDERS,**

       **Plaintiff,**

**v.**                                    **Civil Action No.**  3:25cv124

**TRANS UNION, LLC,**
SERVE:   Corporation Service Company, Reg. Agent
           100 Shockoe Slip, FL 2,
           Richmond, VA 23219-4100

**EQUIFAX INFORMATION SERVICES, LLC,**
SERVE:   Corporation Service Company, Reg. Agent
           100 Shockoe Slip, FL 2
           Richmond, VA 23219-4100

**EXPERIAN INFORMATION SOLUTIONS, INC.,**
SERVE:   CT Corporation System, Reg. Agent
           4701 Cox Rd., Ste. 285
           Glen Allen, VA 23060-6808

**and**

**CAPITAL ONE BANK USA, N.A.**
SERVE:   Corporation Service Company, Reg. Agent
           100 Shockoe Slip, FL 2
           Richmond, VA 23219-4100

        **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Marcus D. Sanders, by counsel, and for his Complaint against

Defendants Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"),

Experian Information Solutions, Inc. ("Experian"), and Capital One Financial Corporation ("Capital One"), he states as follows:

## PRELIMINARY STATEMENT

1. This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Trans Union, Equifax, and Experian are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4. Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C. § 62(a)(20). For the purposes of 26 U.S.C. § (a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C. § 62(e) to mean "an act that is unlawful under . . . [a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights."

5. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a

consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6.      Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

7.      In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

8.      If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id*. at 10.

9.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Capital One, particularly when a consumer makes a dispute about information reported.

10.     Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, those entities include Capital One (the "Defendant Furnisher"), Applied Bank, Heights Financial Corporation, Purdue FCU, World Finance Corporation, Verizon Wireless, Sable/Coastal Community Bank, Kickoff Lending LLC, Sunrise LA, and First Premier. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

11.     Plaintiff brings claims under Section 1681e(b) against Trans Union, Equifax, and Experian because each reported inaccurate account information about Plaintiff regarding a fraudulent Capital One account, along with numerous other fraudulent accounts. When Plaintiff disputed the inaccuracies, Trans Union, Equifax, and Experian did not reasonably investigate, also violating Section 1681i.

12.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Trans Union, Equifax, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Trans Union, Equifax, and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-

4

creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

13.    Likewise, Capital One violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Capital One did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting. Capital One failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice.

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

15.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). A substantial portion of the events giving rise to the claim occurred in this District and Division.

**PARTIES**

16.    Plaintiff is a natural person, and a "consumer" as defined by 15 U.S.C. § 1681a(c).

17.    Trans Union is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

18.    Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19.    Trans Union disburses consumer reports to third parties under contract for monetary compensation.

20.    Equifax is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

21.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

23.     Experian is a foreign corporation authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

24.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

25.     Experian disburses consumer reports to third parties under contract for monetary compensation.

26.     Capital One Bank, National Association is a Stock Corporation authorized to do business in the Commonwealth of Virginia with its principal office located in McLean, Virginia and its registered agent in Richmond, VA.

27.     Capital One is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

28.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement

6

of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

29.    "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

30.    Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic....
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the

protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….

Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

31.    Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

32.    Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly…of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

33.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term

8

'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

34.    It has long been the law that a CRA, such as Trans Union, Equifax or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

35.    That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).   Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

36.    As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

37.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

38.     It has long been the law − since 1970 in fact − that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

*Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Capital One to Perform a Detailed and Systematic Investigation of Consumer Disputes*

39.    Today, furnishers such as Capital One have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

40.    Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

41.    Additionally, Capital One has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether the consumer disputes such reporting.  *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

*Plaintiff Discovers the CRA Defendants were Reporting the Fraudulent Furnisher Accounts and Disputes Those Inaccuracies*

42.    Plaintiff is the victim of identity theft.

43.    An unknown individual opened a variety of consumer accounts, rented a car, and even received an Internal Revenue Service Form 1099 in Plaintiff's name using Plaintiff's personal identifiers.

44.    In or around June or July of 2021, Plaintiff discovered that an individual fraudulently acquired a rental car in Georgia using Plaintiff's personal information. This imposter was involved in a car accident while driving the rental and continued to impersonate Plaintiff when interacting with the investigating officer, which resulted in formal charges being filed against Plaintiff.

45.    In August 2021, Plaintiff filed a police report with the Lafayette Indiana Police Department and placed a freeze on his credit to prevent further fraudulent activities.

46.    In late 2023, Plaintiff discovered extensive false information in his credit reports, including credit accounts he never opened, inaccurate addresses where he never resided, employers he never worked for, and phone numbers he never used.

47.    The fraudulent and derogatory credit accounts that Plaintiff discovered in late 2023 were with Applied Bank, Heights Financial Corporation, Purdue FCU, World Finance Corporation, Verizon Wireless, Sable/Coastal Community Bank, Kickoff Lending LLC, and Sunrise LA. Plaintiff did not open any of these accounts, authorize anyone to open any of these accounts on his behalf, or benefit from any of these accounts.

48.    Plaintiff later discovered fraudulent and derogatory accounts with Capital One and First Premier reporting on his credit. As with the fraudulent and derogatory accounts that Plaintiff previously discovered, Plaintiff did not open the Capital One and First Premier accounts, he did not authorize anyone to open these accounts on his behalf, and he did not benefit from these accounts in any way.

**Plaintiff Disputes with Experian**

49.    On or around January 17, 2024, Plaintiff sent a letter to Experian to dispute the inaccurate and derogatory accounts with Applied Bank, Heights Financial, Purdue FCU, World

Finance Corporation, Verizon Wireless, and Sable/Coastal that Experian was wrongfully reporting as belonging to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

50.     Based on available information and belief, Plaintiff did not receive any response from Experian regarding his dispute dated January 17, 2024.

51.     On or around March 4, 2024, Plaintiff obtained a copy of his Experian credit report. Although some of the fraudulent accounts that Plaintiff previously disputed had been removed, Experian was still reporting the fraudulent and derogatory account with Purdue FCU. Additionally, Experian had started reporting a fraudulent charged off account Kickoff lending, LLC.

52.     On or around April 25, 2024, Plaintiff again disputed the fraudulent and derogatory information showing on his Experian credit report by sending Experian a letter, via USPS Certified Mail, Return Receipt Requested.

53.     Based on available information and belief, Plaintiff did not receive any response from Experian regarding his dispute dated April 25, 2024.

54.     On or around August 28, 2024, obtained a copy of his Experian credit report, which included fraudulent and derogatory tradelines for accounts with Capital One, Kickoff Lending, LLC, Purdue FCU, and Sable/Coastal Community Bank. Experian also inaccurately reported addresses in Illinois and Indiana as belonging to Plaintiff, even though Plaintiff has never resided in either state.

55.     Based upon available information and belief, Experian reinserted the fraudulent and derogatory account information for Sable/Coastal Community Bank into Plaintiff's credit report after initially removing it in response to Plaintiff's January 17, 2024, dispute.

13

56.     Based upon available information and belief, Experian did not notify Plaintiff that it reinserted the Sable/Coastal Community Bank tradeline onto his Experian credit report within five (5) business days of doing so, as required by 15 U.S.C. § 1681(i)(a)(5)(B).

57.     Upon information and belief, Experian reinserted the fraudulent and derogatory Sable/Coastal Community Bank tradeline onto Plaintiff's Experian credit report because Experian lacks reasonable procedures designed to prevent the reappearance in a consumer's file of information that is deleted pursuant to 15 U.S.C. § 1681(i)(a)(5).

58.     On or around September 10, 2024, Plaintiff sent a third dispute letter to Experian via USPS Certified Mail, Return Receipt Requested. In his letter, Plaintiff disputed the fraudulent and derogatory accounts with Capital One, Kickoff lending, LLC, Purdue FCU, and Sable/Coastal Community Bank, as well as the inaccurate addresses.

59.     On or around October 10, 2024, Plaintiff received dispute results from Experian.

60.     Although Experian deleted the fraudulent and derogatory Capital One and again deleted the Sable/Coastal Community Bank account, it wrongfully verified the Kickoff Lending, LLC and Purdue FCU accounts as accurate.

61.     Based on available information and belief, Experian continues to wrongfully report the fraudulent and derogatory Kickoff Lending, LLC and Purdue FCU accounts as belonging to Plaintiff.

**Plaintiff Disputes with Trans Union**

62.     On or around January 17, 2024, Plaintiff sent a letter to Trans Union to dispute the fraudulent and derogatory accounts with Applied Bank, Heights Financial, Purdue FCU, World Finance Corporation, Verizon Wireless, and Sable/Coastal accounts that Tran Union was

wrongfully reporting as belonging to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

63.    On or around January 23, 2024, Plaintiff received written correspondence from Trans Union via mail, which stated, "we recently received a request that included your information, but it didn't appear that you or a properly authorized third party sent it to us."

64.    On or about February 6, 2024, Plaintiff mailed a letter Trans Union that he had personally initiated the credit dispute. In that letter, Plaintiff included a notarization to verify his identity and reiterated the specific accounts he wished to dispute.

65.    Plaintiff subsequently received two letters in the mail from Trans Union, both dated February 13, 2024. The one letter, Trans Union stated that it "received the identity theft block request" and that "[the] identity theft report is not valid." In the other letter, Trans Union stated that the proof of address Plaintiff provided in his credit report dispute was "unacceptable" because not enough proof was provided.

66.    Plaintiff never requested, nor authorized anyone on his behalf to initiate an identity theft block in connection with his January 17, 2024, dispute.

67.    Plaintiff's January 17, 2024, dispute included his social security number, address, state issued identification and was notarized.

68.    Without further action by Plaintiff, on or about March 7, 2024, Plaintiff received dispute results from Trans Union. Trans Union notified Plaintiff that it had verified the inaccurate and derogatory Purdue FCU and Sable/Coastal Community Bank accounts. The dispute results did not address the inaccurate and derogatory accounts with Applied Bank, Heights Financial Services, Verizon Wireless, or World Finance Corporation.

69.     On or about April 25, 2024, Plaintiff again sent a letter to Trans Union to dispute the inaccurate and derogatory accounts that Trans Union was wrongfully attributing to Plaintiff. Plaintiff sent the dispute via Certified Mail, Return Receipt Requested, and included a copy of his state issued identification card and social security card. Plaintiff had the letter notarized to verify his identity.

70.     Subsequently, Plaintiff received two different letters via mail, both dated May 1, 2024, from Trans Union. In one letter, Trans Union again stated Plaintiff's proof of address was unreasonable, while in the other letter, Trans Union stated, "after revieing your dispute request, we found the information you disputed does not currently appear on your TransUnion credit report."

71.     On or around September 5, 2024, Plaintiff obtained a copy of his Trans Union credit report. The report showed that Trans Union continued to report the inaccurate and derogatory accounts with Purdue FCU and Sable/Coastal Community Bank. Additionally, Plaintiff was dismayed to learn that Trans Union was now reporting an inaccurate and derogatory accounts with Capital One account, Security Credit Services, Aaron's, and Sunrise Bank.

72.     Plaintiff did not open any of the inaccurate and derogatory accounts or authorize anyone to open any of the inaccurate and derogatory accounts on his behalf.

73.     On or around September 10, 2024, Plaintiff again disputed, for a third time, the accounts that Trans Union was wrongfully attributing to Plaintiff. Plaintiff notarized the dispute letter and included a copy of his state issued identification card and Social Security Card. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

74.     On or about September 17, 2024, Trans Union once again mailed a letter, requesting additional documentation to verify Plaintiff's identity, in response to Plaintiff's notarized dispute.

16

75.     On or around October 13, 2024, Plaintiff received dispute results from Trans Union. Although Defendant deleted the Sable/Coastal Community Bank and Aaron's Sales and Lease accounts, it wrongfully verified as accurate the Capital One Bank, Purdue FCU, and Sunrise Bank accounts. Trans Union failed to mention the Security Services, Inc. account in its dispute results.

76.     Based upon available information and belief, Trans Union continues to report several of the inaccurate and derogatory accounts on Plaintiff's credit file, including accounts with Capital One Bank, Purdue FCU, Sunrise Bank, and Security Services, Inc.

**Plaintiff Disputes with Equifax**

77.     On or around January 17, 2024, Plaintiff sent a letter to Equifax to dispute the inaccurate and derogatory accounts with Applied Bank, Kickoff Lending, LLC, Heights Financial Services, Purdue FCU, World Finance Corporation, Verizon Wireless, Sable/Coastal Community Bank, and Sunrise LA that Equifax was wrongfully attributing to him. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

78.     On or around February 11, 2024, Equifax notified Plaintiff of the results of his dispute. Equifax wrongfully verified the accounts with Kickoff Lending, LLC, Sable/Community Bank, Sunrise LA, and Purdue Federal Credit Union as belonging to Plaintiff. Equifax did not address Plaintiff's dispute of the Heights Financial Services account in its results.

79.     For reasons better known to Equifax, the February 11, 2024, dispute results included a "Prinaicpal Bank account" and stated, "disputed item is not reporting." Plaintiff did not dispute Prinaicpal Bank, as the bank did not appear on his Equifax report and does not know why that item was included in his Equifax dispute results.

80.    On or around April 25, 2024, Plaintiff sent a letter to Equifax to again dispute the inaccurate and derogatory Heights Financial Services account that Equifax was reporting on his credit. Plaintiff sent the dispute letter via Certified Mail, Return Receipt Requested.

81.    Based upon available information and belief, Equifax's response to Plaintiff's April 25, 2024, Equifax dispute contained only pages 14 to 24 of a 24-page dispute result.

82.    On or around August 28, 2024, the Plaintiff obtained a copy of his Equifax credit report. The report showed that Equifax was still reporting many inaccurate and derogatory accounts as belonging to Plaintiff, including accounts with: Capital One Bank (which was not previously reported), Kickoff Lending LLC, Purdue FCU, Sable/Coastal Community Bank, Sunrise Banks, and Security Credit Services. Notably, Security Credit Services had purchased the also inaccurate and derogatory World Finance Corporation debt, which the Plaintiff had previously disputed and which Equifax had previously agreed to delete.

83.    On or around September 10, 2024, Plaintiff sent another letter to Equifax to dispute the inaccurate and derogatory accounts showing on his Equifax credit report with Equifax. Plaintiff sent the dispute via USPS Certified Mail, Return Receipt Requested.

84.    On or around November 16, 2024, Equifax notified the Plaintiff of the results of his dispute. After nearly a year and three disputes, Equifax removed the Sable/Coastal Community Bank and Kickoff Lending, LLC accounts from the Plaintiff's credit report. Additionally, Equifax once again deleted the inaccurate and derogatory debt originating from World Finance Corporation, which had been sold to and reinserted on the Equifax report by Security Credit Services.

85.    For reasons better known to Equifax and unclear to Plaintiff, Equifax failed to provide conclusive dispute results for the accounts with Purdue FCU, Sunrise Banks c/o Self

Financial Inc, Aaron's Inc, and Capital One Bank. Equifax's letter stated: "We have researched the credit account . . . the results are: **-** [.]"

86.    Plaintiff obtained a copy of his Equifax credit report on or around November 22, 2024. At that time, the Equifax report no longer contained the disputed accounts.

87.    Upon information and belief, Trans Union is still reporting the inaccurate and derogatory Capital One Bank account, and Experian is still reporting the inaccurate and derogatory Kickoff Lending, LLC, and Purdue FCU accounts.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

88.    Unknown to Plaintiff until this lawsuit, it has long been the practice of Trans Union, Equifax, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor previously known as Intelenet Global Services and now known as Teleperformance.

89.    Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

90.    Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

91.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

92.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

93.     Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

94.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

95.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian.  It gets sent to the Defendant CRAs' creditor customers (such as Capital One) for their sole review and consideration.

96.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's

representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

97.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

98.     Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage, or reliably influence the employees of their respective third-party outsource vendors.

99.     Trans Union, Equifax, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Capital One, Who Did Nothing

100.     In each instance in which Plaintiff disputed the Capital One account with the CRAs, the CRAs forwarded Plaintiff's disputes to Capital One using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results back to CRAs.

101.     On information and belief, e-Oscar is also the system by which Capital One has agreed it will accept consumer disputes from the CRAs.

102.    Each instance in which Capital One received one of Plaintiff's disputes from a CRA, Capital One became obligated under the FCRA to investigate that dispute.

103.    Plaintiff's disputes to Capital One to attempt to have it reinvestigate his complaints went unanswered, as Capital One continues to report the fraudulent account to Trans Union.

104.    Capital One failed to reinvestigate Plaintiff's complaints.

105.    Despite Plaintiff's diligent efforts to use the legal means that are available to him to report his victimization by identity theft, Capital One continued (and continues still) to report the fraudulent account as accurate to the CRAs. Discovery will show that all Capital One did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

106.    On dates better known to Trans Union and Capital One, Trans Union furnished Plaintiff's disputes to Capital One.

107.    On dates better known to Equifax and Capital One, Equifax furnished Plaintiff's disputes to Capital One.

108.    On dates better known to Experian and Capital One, Experian furnished Plaintiff's disputes to Capital One.

109.    In violation of § 1681s-2(b)(1)(A) of the FCRA, Capital One failed to reasonably reinvestigate Plaintiff's disputes that Capital One received from Trans Union, Equifax, and Experian.

110.    Capital One further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct, delete, or permanently block the account after receiving Plaintiff's disputes from Trans Union.

111.    The Defendant CRAs responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. These responses confirm that the Defendant CRAs communicated Plaintiff's disputes to Capital One.

112.    Upon information and belief, CRA Defendants timely notified Capital One of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

113.    Upon information and belief, Capital One received timely notice of Plaintiff's disputes from Trans Union, Equifax, and Experian, and the supporting documents submitted with Plaintiff's disputes.

114.    By its actions as described herein, Capital One furnished and communicated false credit information regarding Plaintiff.

*Capital One Repeatedly Obtained and Used Plaintiff's Consumer Report(s) Without a Permissible Purpose*

115.    Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681(f).

116.    One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

117.    Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A).

*Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

118.    Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow Capital One to access Plaintiff's consumer reports.

119.    Capital One first accessed Plaintiff's credit file in connection with its issuance of the fraudulent account in October 2023. The information Capital One received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to Capital One to purportedly authorize it to access Plaintiff's credit report to issue a consumer account would have revealed that the application was fraudulent. Nonetheless, Capital One illegally accessed Plaintiff's consumer report(s) and then issued a fraudulent consumer account based on an illegally obtained consumer report(s).

120.    But for Capital One's illegal access of Plaintiff's consumer reports, the fraudulent Capital One account would not have been created.

121.    Capital One used information from one or more illegally obtained consumer report(s) regarding Plaintiff to further its illegal efforts to collect a debt from Plaintiff that he does not owe.

122.    Capital One illegally accessed Plaintiff's consumer reports on multiple occasions, including but not limited to occasions on or around December 2023, and January 2024.

123.    Capital One continued to illegally access Plaintiff's consumer report(s) even after Plaintiff disputed the Capital One account as fraudulent.

### Plaintiff Suffered Actual Harm

124.    All three CRA Defendants continued to report inaccurate and derogatory furnisher accounts on Plaintiff's credit reports, and Trans Union continued to report the inaccurate and derogatory Capital One account, even after being notified about the false information several times over the course of almost a year. Upon information and belief, Trans Union is *still* reporting the fraudulent accounts, including Capital One account on Plaintiff's credit, while Experian continues to report the fraudulent Purdue FCU and Kickoff Lending, LLC accounts.

125.    Plaintiff attempted to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failures to correct the inaccurate reporting.

126.    As a result of the inaccurate reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

    a.  Stress associated with being denied credit and associated delays in applying for future lines of credit;

    b.  Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

    c.  Loss of time attempting to correct the inaccuracies;

25

    d.   Stress associated with attempting to resolve this matter; and

    e.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

### *Defendants' Conduct was Willful*

127.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

128.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

129.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

130.    The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

131.    Just in federal court alone, during the past decade, Capital One has had to defend over 4500 consumer credit lawsuits.

132.    In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

133.    CRA Defendants knew or should have known of this litigation history.

134.     CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

135.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

136.    Each Defendant regularly receives unredacted consumer dispute details from this database.

137.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

138.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

139.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

140.    Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

141.    Just in the last 12 months alone, Trans Union, Equifax, and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

142.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

143.    Trans Union, Equifax, and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is

affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

144.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

145.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other

29

sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

146.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

147.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]    The AG Settlement required, amongst many changes and mandates, that the Defendant comply with § 1681i(a).

148.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

149.    In early 2025, almost two decades after the AG settlement, the Consumer Financial Protection Bureau sued CRA Defendant Experian, seeking injunctive relief, redress, disgorgement, and civil money penalties. In its Complaint, CFPB alleged that:

> Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Release/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7 2025).[4]

150.    As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process." *Id.*

151.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

152.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

153.    Among many of Defendants' accuracy failures, the NCLC Report discovered:

---

[4] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf
[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

154. The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc.*, which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act.

Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

155.    Proportionately similar to the litigation history against the CRAs, in the past decade alone, Capital One has also been sued in federal court over 2400 times for consumer credit claims by consumers – with most  of those suits involving alleged violations of the FCRA.

156.    Since the inception of the CFPB database, Capital One has received over 15,000 consumer complaints from the CFPB regarding its credit reporting errors. Of those complaints, almost 3,300 of these complaints are about Capital One not fixing a credit reporting error after receiving a consumer's dispute.

157.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

158.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

159.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

160.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

161.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

162.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

163.    Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
#### *against Trans Union, Equifax, and Experian*

164.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

165.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Capital One and other creditor furnishers.

166.    As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

167.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Trans Union, Equifax, and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

168.    Trans Union, Equifax, and Experian each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

169.    The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

170.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Trans Union, Equifax, and Experian*

171.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

172.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff' credit files.

173.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(2) by conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

174.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the inaccurate and derogatory furnisher accounts.

175.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the items of information upon a lawful reinvestigation.

176.    After they received Plaintiff's January 2024 Dispute Letters, Experian and Trans Union each violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

177.    As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

178.    The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

179.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT III:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)(5)(B)
### *against Experian*

180.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

181.    Experian violated 15 U.S.C §1681i(a)(5)(B)(i) by its conduct which includes, but is not limited to, reinserting previously deleted information into Plaintiff's credit file without receiving a certification from the entity which had previously furnished the information certifying that the information was complete and accurate.

182. Experian violated 15 U.S.C §1681i(a)(5)(B)(ii) by its conduct which includes, but is not limited to, failing to notify the Plaintiff within 5 days that it had reinserted information into his credit file which had previously been deleted.

183. Experian violated 15 U.S.C §1681i(a)(5)(B)(iii) by its conduct which includes, but is not limited to, failing to provide to the Plaintiff in writing not later than 5 business days after the date of the reinsertion, a statement that the disputed information has been reinserted; the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted Experian, in connection with the reinsertion of such information; and a notice that the Plaintiff had the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

184. As a result of Experian's conduct, actions, and inaction, Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

185. The violations by Experian were willful, rendering Experian liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

186.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT IV:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15. U.S.C. § 1681i(a)(5)(C)
### *against Experian*

187.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

188.    Experian violated 15 U.S.C §1681i(a)(5)(C) by its conduct which includes, but is not limited to, failing to maintain reasonable procedures designed to prevent the reappearance of information previously deleted in response to Plaintiff's disputes in a Plaintiff's file and in Plaintiff's consumer reports.

189.    As a result of Experian's conduct, actions, and inaction, Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

190.    The violations by Experian were willful, rendering Experian liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

191.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(A) & (B)**
*against Capital One*

192.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

193.    Capital One violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished to it by Trans Union, Equifax, and Experian.

194.    Capital One violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Trans Union, Equifax, and Experian forwarded Plaintiff's disputes to Capital One.

195.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

196.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

197.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT VI:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(C) & (D)
### *against Capital One*

198.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

199.    On one or more occasions within the past two years, by example only and without limitation, Capital One violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing false information within Plaintiff's credit file with the Defendant CRAs in response to his disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to the Defendant CRAs.

200.    Plaintiff's disputes were, at minimum, bona fide.

201.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

202.    Capital One was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

203.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Capital One intended its employees or agents follow.

204.    On information and belief, Plaintiff alleges that Capital One's employees or agents did not make a mistake in the way they followed Capital One's procedures when they received, processed and responded to the Defendant CRA's ACDVs and did not include a proper notation regarding the account being in dispute.

205.    On information and belief, the Plaintiff alleges that Capital One has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

206.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

207.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT VII:
## VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(E)
### *against Capital One*

208.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

209.    On one or more occasions within the past two years, by example only and without limitation, Capital One violated 15 U.S.C. § 1681s-2(b)(1)(E) by publishing the inaccuracies within Plaintiff's credit files with Trans Union, Equifax, and Experian and by failing to correctly report results of an accurate investigation to Trans Union, Equifax, and Experian.

210.    Plaintiff's disputes were, at a minimum, *bone fide*.

211.    On information and belief, Plaintiff alleges that Capital One's employees or agents did not make a mistake (in the way in which they followed Capital One's procedures) when they received, processed, and responded to the Trans Union, Equifax, and Experian ACDVs.

212.    On information and belief, Plaintiff alleges that Capital One has not materially changed its FCRA investigation procedures.

213.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

214.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

215.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT VIII:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681b(f)**
***against Capital One***

216.    Plaintiff realleges and incorporates the foregoing paragraphs as it fully set out herein.

217.    Capital One repeatedly violated 15 U.S.C. § 1681(b)(f) by unlawfully obtaining Plaintiff's consumer reports without Plaintiff's written authorization or a permissible purpose.

218.    Capital One also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

219.    Plaintiff's consumer report(s) contained a wealth of private information which Capital One had no right to access absent a specific Congressional license to do so.

220.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, loss of credit opportunities, severe depression and anxiety, loss of appetite, nausea, changes in weight, back and shoulder pain, heart palpitations, high blood pressure, irritability, muscle spasms, nightmares, sleep loss, feelings of fear, feelings of shame, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance (resulting in job loss), harm to reputation, and loss of privacy.

221.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

222.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

**DEMAND FOR RELIEF**

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Trans Union, Equifax, Experian, and Capital One;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully Submitted,

**MARCUS D. SANDERS**

By: Adam W. Short
Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660

Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

*Counsel for Plaintiff*